Good morning. Cyril Tchaikovsky for Beach-Charleston, representing the appellant Bill Copeland. I'd like to reserve a few minutes for rebuttal. Counsel, in trying to picture this accident, did the driver have additional straps in the car or on the vehicle that he did not use to secure the load? I think there is no record of that, Your Honor. There is no answer? There is no answer. You don't know whether he did or didn't? All I can say is the record doesn't manifest whether or not there's additional straps or not. He used the straps that he had available, and that's the extent of that. Well, and then he was told he could get other straps and use those because the ones he had originally were frayed or destroyed, right? That's correct. And yet the load apparently shifts, and I'm just wondering, was it properly strapped or not? Well, Your Honor, that is one of the problems and the flaw in any kind of decision that the accident was preventable, is that without an adequate investigation by Ryder, there's no way to determine. Well, Ryder wasn't the only investigator. That's correct. And the police officer, Villa, concluded that there was no speeding and, more importantly, that he did not attribute any fault to Mr. Copeland. So the load just jumped and did it all by itself? Your Honor, the load did what it did, and the question is, where does culpability lie here? And we have a tribal issue of fact. That's not the question. No. The question isn't who is culpable for causing the load to tip. The question is, is it not, whether they discriminated against him. That's the question. And they can make a terrible mistake in terms of whether the load tipped or not. That's not the point, is it? Well, I disagree respectfully, Your Honor, because I think when you analyze the issue of pretext, we go to their motivation and the basis, the foundation for their pretext. And I submit that if, in fact, they are involved in creating the very conditions that give rise to that load moving, then it's, I think, a shame to say somehow that Mr. Copeland is solely responsible, based on the speculation that he possibly didn't tie the load properly, because there is no evidence of that. But what we do have is evidence of the custom and practice of telling these drivers that if you've got bad straps, go and cannibalize other straps. Now, when we look at the straps themselves in the photographs, and the board, when they made their decision to discharge him, saw those straps, and any knowledgeable person in this industry would look at the color of those straps and that they were frayed and would know that those drivers shouldn't be using those straps. Why did he use them? Well, it's Hobson's choice, in a sense, isn't it? He had no choice. There was alternative supply of straps, as I understand it, and all the drivers knew that if the ones they had on their vehicle were not in shipping shape, so to speak, they could go get other ones. Your Honor, what they could... They cannibalized another truck, is what they were doing. Yes, and for a number of years to do that, and ultimately those straps were never replaced. And what you had is all... The inventory of straps were these old frayed straps. There's no record that somehow there were new straps in a box in the warehouse that they could go and get, or that there were satisfactory straps on another vehicle. These drivers... You're saying every strap in the whole fleet that was in the yard was defective. Is that what you're saying? I'm saying that at the point in time when Mr. Copeland had to take his truck out, these were the best available straps that he had, and he had asked for new straps, and they were never made available. And more importantly... And did he testify that there were no other straps in the yard available to him? Your Honor, I don't think the record goes one way or the other on that. But would I... You still have to get back to Judge Fernandez's question. This is all very interesting, but you have to get back, how does this show the genuine tribal issue of fact that his age played a factor in the decision to terminate him? Age was one of the factors, as well as disabling injuries and the denial of the workers' compensation benefits. Wait a minute. The question... Suppose you're correct. All they have is lousy straps. That's what the company has, is lousy straps. And they say to their drivers, you know what? You can use as many straps as you want. You can use whatever straps you want to use. But let me tell you something. If something breaks loose and there's an accident, we consider that preventable. That's what we consider it. If there's a terrible accident, lots of money lost, and the strap broke, too bad. That's our policy. Suppose they say that. They don't, though, do they? And they go one step further. Preventable accident, because you're the captain of your ship, and if you didn't think the straps were good enough to hold that load, that's your problem. You shouldn't have driven the truck out of it. That's what they say. Well, Your Honor, they certainly didn't say before he went out on that last trip. But on top, I must say that we have to go one step further, is that we have to look at the pretext in conjunction with denying him his workers' compensation benefits. And they deny him his workers' compensation benefits on the stated reason that he was fired. And so you cannot have a pretext, a trumped-up pretext, saying that the accident was preventable when you are inculpated in that process of the strap issue. And that was my point in terms of why the straps are so important here, is that they show that the pretext is a sham, that they knew at that time that Bill Copeland was not the principal factor in causing this injury. If it were otherwise, we would have any time a driver is driving a truck and he has a load and shifts, you would ultimately always have a preventable accident attributable to the driver. And that's just not the correct state of the law. You have to look at what caused this accident. And if there's a tribal issue of evidence that conflicts with their pretext, then I think there should have been a denial of summary adjudication and I'll reserve my time for rebuttal. Okay. Weren't the employees of Rider Trucks at will employees? Yes, they were. And that's what he was hired as, wasn't he? That's correct. So for any reason, they could reduce the force, right? Not if the reason is against public policy and a violation of the statute. After a major accident, they made up their mind that that was the end and they terminated him. And what I'm asking is that you have to look at the record and scrutinize the stated reasons for the termination. And I would submit there's a tribal issue that there was no foundation and it was trumped up. Okay. All right. So you can save the balance of your time for rebuttal. All right. Good morning, Your Honor. This is Thomas Kaufman, Saif Arthshah for the Rider. I think at the very beginning, you asked the right question, Your Honor, that what is the question here? And it's not whether or not Mr. Copeland was ultimately at fault for this accident. The Rider stated a reason for terminating Mr. Copeland, which was that it had found that he had a preventable accident that caused over a requisite amount of damage. And there's no dispute that there was the damage that under their policy, that if it's a preventable accident, you're automatically terminated. And there's no dispute that they've carried this policy out consistently. There's no allegations that certain people had a similar accident and weren't terminated. Really, all that's been said by the appellant is Mr. Copeland can't be blamed for this because the straps were defective. Your Honor's asked a question whether Mr. Copeland had additional straps and whether there's anything in the record that he chose to use fewer straps than he had available. And, in fact, if you look at our footnote 38, which refers to pages 511 and 512 of the record, Mr. Copeland testified that there were additional straps he decided not to use. Mr. Copeland testified, and I believe he set this forth at page 10 of our brief, that he thought the load was safe. He tied it himself. He believed there were sufficient straps. He thought it was tied properly. And he knew that if it was unsafe, he didn't have to drive. He had the right, as he understood it, not to drive the truck if it was unsafe. Did Ryder have standards for securing the loads? There's nothing in the record that I've seen that there was a specific rule of how you do it. Didn't the investigating police officer understand standards of tie-down? No. In fact, Officer Vela, who investigated the accident, we mentioned this in our brief, all he looked into was whether or not there had been a violation of the traffic rules. You would ask how this accident happened. There were two large iron billets on either side of the truck. Mr. Copeland drove onto an on-ramp at about 7 miles per hour. And there's no evidence, and we don't claim there was any evidence, that he broke a traffic law in doing that. The officer did take photographs, though. Actually, I think it was Mr. His supervisor is the one who took the photographs. Yes, right. Okay. Right, Mr. Corley. So, again, the question is, was this preventable? And either it was preventable because he didn't use enough straps, he made that bad judgment as to how to tie the load, or he should have known under the circumstances not to drive the truck. All of these are examples simply of was this preventable. And I think it's very important is that there was an investigation. Mr. Copeland was allowed to participate in the investigation, and he himself never suggested the problem was bad straps. He said, I don't know what caused the accident. Under those circumstances, Ryder was entitled to conclude that it was a preventable accident. Maybe somebody else looking at the situation would reach a different conclusion, but that's not the question. The question is simply was this. There's some kind of inconsistencies or implausibilities that would suggest pretext, and even then there's got to be something that ties this to the real reason being age discrimination, disability discrimination, or workers' compensation retaliation. I should note, although I don't think there's really a realistic effort here to blame this on Mr. Copeland's age, Mr. Copeland was 56 years old when hired and 60 when the accident happened. And I suppose there could be some theoretical person who draws a line that I only want my drivers to be 56 to 59, but that doesn't raise any kind of inference that his age was a factor. There was a review board who didn't even know about his disability or his workers' comp claim who looked at this and included members of non-management who weren't even from the area where Mr. Copeland worked. He didn't tell them the problem was the straps, and all of them unanimously concluded it was a preventable accident. When did he seek workers' comp? He sought workers' comp right after. I think there was a period, there is evidence in the record, that there was some delay in his claim being approved, but it was approved and he was paid everything. Again, I never really understood the situation. Was he even terminated when they told him you're not eligible for workers' comp, or was he still technically employed? When he called, I think he had been terminated. That's why he said he had this conversation with a woman in the workers' comp department who said, oh, you've been terminated, that means you don't get workers' comp benefits. But he did get workers' comp benefits, and in fact, there's no connection whatsoever between being terminated and getting your benefits. He gets benefits, I think, to this very day, at least until the last day of the record. And I do think it's important, although I don't think it's a close call in this case at all, I do think it's important, the argument we raised that the trial court never reached, which is even if there had been workers' comp retaliation, which I don't think there's any evidence there was, that's not a proper basis of a wrongful termination in violation of a public policy claim. A claim that says I was fired because I brought a workers' comp claim must be filed before the workers' compensation appeals board. Isn't there some California law that does recognize the retaliation claim for? The only case that was cited, City of Moorpark, what it says is if I have a disability discrimination claim, and my disability is as a result of an industrial injury, Section 132A, which is the statute that is a workers' compensation retaliation statute, doesn't prevent me from bringing a claim under the Fair Employment and Housing Act for disability discrimination. But that case, there's no case that says you're allowed, other than in the workers' compensation appeals board, to sue saying my theory is you fired me in retaliation for filing a workers' comp claim. We cited some cases, they're only district court decisions, but there's an exclusive forum for that kind of claim. It's not the exclusive remedy for any claim that arises from an industrial injury. So we're not saying, we think Mr. Copeland could, if he had facts for it, go forward with a disability discrimination or an age discrimination claim. But he can't. He's trying to have a claim for workers' compensation retaliation. And even if he had facts for it, which he doesn't, he simply can't proceed with that claim in the court system. It has to go to the workers' comp appeal board. I'm trying to think if there's any other key, if there's any other questions Your Honors have, I'm happy to address them. I don't see or hear any, so thank you. If you please, Your Honor. Cyril Sheikowski again in rebuttal. There was a statement made by counsel that somehow the issue isn't whether or not Mr. Copeland was at fault. And that was said in the beginning. I don't know whether that was a misstatement, but that is central to whether or not the accident was preventable. So to say somehow that that's not an issue I think is incorrect. At the hearing itself, the board knew that Mr. Copeland had filed a workers' compensation because Mr. Cortlett, the manager of the facility, was there with the board. They were all together conferring. And the workers' compensation application had been filed well before the December decision by that board. And so there was no doubt that they were aware that the workers' compensation application had been made. Did he tell that board, you know what, it's your stinking straps that are at fault, not me? Your Honor, he did not. But one point to respond to that is that at the time of the investigation and at the time of the accident, Mr. Copeland had injuries. He was taken away by ambulance. He had a concussion. He was thrown into the windshield so that he wasn't present at the time the investigation was conducted  Those findings arose well after. And more importantly, Mr. Copeland wasn't aware that Mr. Cortlett had followed a practice of never replacing these straps. But more importantly, when requests were made, the workers had believed that Mr. Cortlett was going and making orders for those straps. And Mr. Cortlett, in his deposition, indicated that he never made a single order for a new strap. After several years of demands for new straps by the drivers. And this goes to the motivation of a cover-up and trumping up the pretext for his determination. The age factor comes into play where you have workers at the facility referring to Mr. Copeland as the old man. And then you have the board itself, at the very time he's terminated, telling him that he really should retire and not do this anymore. And that, I think, is certainly direct evidence of some age bias. At least enough to create a tribal issue of fact. The workers' comp application occurred shortly after the accident. Then there was the termination. There was a board hearing. And then ICAR, the human resource person, denies workers' compensation benefits because of his discharge. It is only because Mr. Copeland went to the state of California and applied for state disability. And the state put a lien on riders' workers' compensation insurance that riders had to reconsider its position in the year 2004. And then pick up his workers' compensation benefits. Moore Park is a case that says, yes, an at-will employee can be charged for reasons. But those reasons cannot violate public policy and violate statutes, particularly 132A, and also when someone has disabling injuries. Thank you. Okay. Thank you. Case will be submitted at this time. Appreciate your arguments. And we move on to American Trucking Associations, Inc., versus the city of Los Angeles.
judges: Beezer, Fernandez, Paez